THE PEOPLE OF THE STATE OF NEW YORK ex rel. NEW YORK STEAM COMPANY, Relator, *v.* OSCAR S. STRAUS and Others, Constituting the Public Service Commission for the First District, Respondents.

First Department, March 7, 1919.

**Public service corporations — contracts of steam supply corporation entered into under schedules filed — amendment of schedules — Public Service Commission cannot require such corporation to perform unexpired contracts at old rates — said Commission without equitable powers — discrimination between consumers contrary to statute.**

Where a public service corporation in the city of New York engaged in supplying live steam for heating and power had filed with the Public Service Commission its schedule of rates and had entered into contracts with various consumers under the schedules filed and thereafter the corporation filed a new schedule with said Commission changing and increasing its rates, the Public Service Commission is without jurisdiction to rule that the holders of unexpired contracts are not subject to the new schedules and must be furnished with steam at a lower rate than new consumers until such time as the prior contracts have expired. The Public Service Commission is without power to compel such corporation to file and post a supplement to its new schedule preserving the old rates as to outstanding contracts.

The Public Service Commission has no equitable jurisdiction to enforce the specific performance of such outstanding contracts, for the performance of such contracts can only be enforced through the decree of a court of equity and the powers of the Public Service Commission are limited by the statute and are purely administrative.

First Department, March, 1919.          [Vol. 186.

Moreover, such action by the Public Service Commission is discriminatory and contrary to the statute which requires equal rights for equal service and allows only a classification of rights based upon a difference of circumstances and conditions of service.

*Held,* that even if the Public Service Commission possessed equitable powers the supplemental schedule required to be filed was arbitrary and not based upon facts or circumstances justifying the same.

Certiorari issued out of the Supreme Court and attested on the 28th day of March, 1918, directed to Oscar S. Straus and others, constituting the Public Service Commission for the First District, commanding them to certify and return to the office of the clerk of the county of New York all and singular their proceedings had in regard to the rates and charges of the relator.

*George Zabriskie,* for the relator.

*Godfrey Goldmark* of counsel [*William L. Ransom, Jacob H. Goetz* and *Harry M. Chamberlain* with him on the brief], for the respondents.

Merrell, J.:

The relator seeks to review by certiorari proceedings an order made by the Public Service Commission of the State of New York for the First District on February 25, 1918, requiring the relator to issue, file and post a supplement to its schedule of rates filed June 1, 1917, which shall provide that all contracts made in conformity with a schedule of rates theretofore filed by said relator and which became effective November 1, 1916, unless thereafter canceled by mutual consent, shall be in full force and effect, and which order of said Public Service Commission required the relator to notify said Commission on or before March 2, 1918, whether the terms of said order were accepted and would be obeyed.

This court is asked to review all proceedings before said Public Service Commission relating thereto, and to set aside and vacate said order.

In compliance with a writ of certiorari heretofore issued out of and under the seal of the Supreme Court on the petition of the relator requiring said Public Service Commission for the First District of New York to make return of the said writ and of its said order, together with all proceedings remain-

ing of record relating thereto, to the end that this court may cause to be done what of right and according to law ought to be done, a return has been made and the matter is before us for determination.

By the petition and return herein, the following facts are disclosed:

The relator is a domestic corporation owning, operating and managing a steam plant for generating and transmitting, distributing and selling steam for heat or power in the city of New York. The said Public Service Commission, by an order made November 24, 1914, directed that every steam corporation subject to its jurisdiction should, at least thirty days prior to any schedule of rates or forms of contract becoming effective, file with the Commission and, for the same length of time, keep open for public inspection, all printed schedules showing rates and charges made, established or enforced, or to be charged or enforced, all forms of contract or agreement, and all rules and regulations relating to rates, charges or service, used or to be used, and all general privileges or facilities granted or allowed by such steam corporation; and further ordered that any schedule might be changed upon statutory notice of thirty days or, under special permission from the Commission, upon shorter notice. Such order of the Public Service Commission was duly accepted by the relator, and the Commission was notified of its acquiescence thereto. On or about October 31, 1916, under permission of said Public Service Commission, the relator duly filed with the Commission a schedule of rates, as required by said order, wherein it was plainly stated what rates, charges and services would be made. Said schedule of rates became effective November 1, 1916. Thereafter and before April 14, 1917, various contracts were entered into by the relator with consumers, whereby the relator contracted and agreed to supply steam at the rates and upon the terms stated in its said schedule, said contracts, by their terms, all expiring after June 1, 1917. On May 1, 1917, the relator issued, filed and posted in the office of said Public Service Commission a new schedule changing that which it had theretofore filed and which had been effective since November 1, 1916, fixing other and increased rates and charges for steam to be furnished by it,

stating the proposed changes to be made and that the new schedule would become effective June 1, 1917. As before stated, on the date when said new schedules were established and posted, contracts were in force under the existing schedule which would not terminate prior to June 1, 1917, when the new schedule was to become effective. No separate classification was made of such existing contracts, and the holders of such contracts were not excepted from the operation of the new schedule. On May 28, 1917, the relator advised its customers in writing concerning the new schedule to become effective June 1, 1917, and stated to its said customers and to those holding contracts made under the schedule effective November 1, 1916, and which by their terms expired subsequently to June 1, 1917, that all provisions of the new schedule as to rates, terms and conditions were applicable to such contracts so far as service should be rendered after June 1, 1917, and that bills for steam used by said contract holders would be computed on the basis of the proper rate schedule applicable in each case to the particular class of service rendered. It is claimed by the relator that the rates and charges fixed in the new schedule were necessitated because of the advances in cost of fuel and other requirements of the petitioner, including labor and other necessary expenses, in producing the commodity which it was selling, and that the new rates established by the schedule taking effect June 1, 1917, were neither unjust, unreasonable, nor unjustly discriminatory, or otherwise contrary to law. The holders of the unexpired contracts complained to the said Public Service Commission of the alleged injustice of the relator in applying its new schedule of rates to existing and outstanding contracts, and on October 11, 1917, said Public Service Commission, of its own motion ordered a hearing concerning the rates and charges of the relator in the borough of Manhattan, New York city, and appointed a hearing before said Commission on October 22, 1917, for the purpose of inquiring into and determining whether the rates and charges as scheduled by the relator were unjust and unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of law, and if found unjust, unreasonable, discriminatory or illegal, then to determine just and reasonable rates and charges

for service furnished by the petitioner. Pursuant to such appointment proceedings were had before the Commission and the order of February 25, 1918, sought to be reviewed, was made. In this order it was recited that the Commission was of the opinion and had determined that the act of the relator in canceling by its notice of May 28, 1917, outstanding contracts made pursuant to its schedule effective November 1, 1916, was unjust and unreasonable, and that the new schedule, which became effective June 1, 1917, was unjust, unreasonable and unlawful in so far as it did not separately classify the contracts then in force under the schedule of rates in effect November 1, 1916. By the order the Commission directed that before March 5, 1918, the relator should file and post a supplement to its said schedule of June 1, 1917, which should provide that all contracts made in conformity with its said schedule filed November 1, 1916, and outstanding June 1, 1917, unless thereafter canceled by mutual consent, should be in full force and effect, and that on or before March 2, 1918, the relator should notify the Commission in writing whether the terms of the said order were accepted and would be obeyed. A rehearing before the Commission was asked and denied.

The relator assails such order of the Public Service Commission upon the ground that the order was unauthorized and erroneous, for the reason that it required the relator to demand and receive from persons and corporations with whom it had made said unexpired contracts less compensation for service rendered than the relator charged to others for like service. In other words, that the order required the relator to furnish steam to some persons at lower rates than it was demanding of others, and that said order was erroneous because it required the relator, with respect to rates charged to the holders of such contracts for similar service, to make or grant to them an undue and unreasonable privilege, preference or advantage over others who did not hold such contracts.

Upon such facts the relator prayed the issuance of a writ of certiorari directed to such Public Service Commission requiring it to certify and return to this Appellate Division its said order and all proceedings of record relating thereto,

to the end that the determination of said Commission and its said order might be reviewed and corrected by the court according to law. Thereupon the writ of certiorari was issued herein.

It is the position of the relator herein that all of said contracts, concerning, as they do, a public utility, may be lawfully changed, as to the rate to be charged, in the manner prescribed by law, even though such change be voluntarily effected by the utility company itself. It is, nevertheless, conceded that any change in rate or regulation by new schedule may, after hearing duly had, be declared unreasonable and discriminatory by the Public Service Commission. But as long as the new schedule is permitted by the Public Service Commission to remain in effect, it is binding alike upon all consumers from the time the new rate becomes effective, irrespective of any contract agreement with the utility company theretofore made by such customers, and which may not then have expired. It is the position of the relator that all contracts between a public service corporation and a private individual as to rates are at all times governed by the schedule on file; that being bound to render service at uniform rates, a public utility company may not, through long term contracts, fix rates to be charged beyond the term of current schedules.

Steam corporations of the character of the relator were brought within the provisions of the Public Service Commissions Law (Consol. Laws, chap. 48; Laws of 1910, chap. 480) by chapter 505 of the Laws of 1913, and by said chapter, article 4-A, being sections 78 to 89a, inclusive, was added to the Public Service Commissions Law. Section 79 of the Public Service Commissions Law, thus added, provides as follows:

" § 79. Adequate service; just and reasonable charges; unjust discrimination and unreasonable preference. 1. Every steam corporation shall furnish and provide such service, instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable. All charges made or demanded by any such corporation for such service rendered or to be rendered shall be just and reasonable and not more than allowed by order of the Commission having jurisdiction. Every unjust or unreasonable charge made or demanded for

such service, or in connection therewith or in excess of that allowed by law or by the Commission is prohibited.

"2. No such corporation shall directly or indirectly by any special rate, rebate, drawback or other device or method, charge, demand, collect or receive. from any person or corporation a greater or less compensation for such service rendered or to be rendered or in connection therewith, except as authorized in this chapter, than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service with respect thereto under the same or substantially similar circumstances or conditions.

"3. No such corporation shall make or grant any undue or unreasonable preference or advantage to any person, corporation or locality, or to any particular description of service in any respect whatsoever, or subject any particular person, corporation or locality or any particular description of service to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

"4. Nothing in this chapter shall be taken to prohibit any such corporation from establishing a sliding scale for a fixed period for the automatic adjustment of charges for such service or any service rendered or to be rendered and the dividends to be paid to stockholders of such corporation, provided that the sliding scale shall first have been filed with and approved by the proper Commission; but nothing in this subdivision shall operate to prevent the Commission after the expiration of such fixed period from fixing proper, just and reasonable rates and charges to be made for services as authorized in this article."

The right of the Public Service Commission to regulate rates to be charged for public service is derived from subdivision 4 of section 80 of said law. Among other things, that subdivision provides as follows: "Whenever the Commission shall be of the opinion, after hearing had upon its own motion or upon complaint, that the rates or charges or the acts or regulations of any such person or corporation, are unjust, unreasonable, unjustly discriminatory or unduly preferential or in any wise in violation of any provision of law, the Commission shall determine and prescribe the just

and reasonable rates and charges thereafter to be enforced for the service to be furnished, and the just and reasonable acts and regulations to be done and observed."

Section 85 of the Public Service Commissions Law provides that " The price fixed by the Commission under this section or under subdivision five [four] of section eighty shall be the maximum price to be charged by such person, corporation or municipality for steam for the service to be furnished within the territory and for a period to be fixed by the Commission in the order, not exceeding three years except in case of a sliding scale, and thereafter until the Commission shall, upon its own motion or upon the complaint of any corporation, person or municipality interested, fix a higher or lower maximum price of steam to be thereafter charged.   In determining the price to be charged for steam the Commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard among other things to a reasonable average return upon capital actually expended and to the necessity of making reservations out of income for surplus and contingencies."

It will be seen that under subdivision 4 of section 80, above quoted, the Commission, when of the opinion that rates and charges are unreasonable, discriminatory or unduly preferential or violative of law, shall determine and prescribe just and reasonable rates thereafter to be enforced for the service rendered.   This, it seems to me, is not what the Commission has attempted to do in the case at bar, but on the contrary, in the instant case, the Commission, by its order, attempts to enforce specific performance of the contracts outstanding at the time the new schedule became effective, and thereby to fix the rates to be charged for the public service rendered. This I deem the statute does not permit the Commission to do.   The order of the Public Service Commission of February 25, 1918, directs the issuance, filing and posting of a supplement to the relator's schedule of June 1, 1917, which supplement would provide that all contracts made in conformity with the schedule of said company effective November 1, 1916, and outstanding June 1, 1917, unless thereafter

canceled by mutual consent, should be in full force and effect. At the time the new schedule of the relator became effective on June 1, 1917, the relator had outstanding twenty-eight contracts made and entered into prior to November 1, 1916, to which the order of the Public Service Commission is inapplicable. The contracts affected by the order of the Public Service Commission requiring the filing of a supplement to relator's schedule effective June 1, 1917, consisted of thirty-five contracts made pursuant to the schedule effective November 1, 1916, and all of which were made prior to April 14, 1917. None of said contracts were for more than one year, and many were for a shorter period. These contracts were for either annual power or for power during the summer. In addition, there were thirteen contracts entered into by the relator between April 14, 1917, and June 1, 1917, in accordance with the rates provided by the schedule effective November 1, 1916, and to each of which was annexed a rider provided for in the supplement effective April 14, 1917, to the effect that the service application or contract should be subject to all changes or modifications in the service charge (rates), rules, regulations or conditions therein contained or applicable thereto which might thereafter become effective upon the issuance thereafter of any new schedule or supplement under order or by permission of said Public Service Commission. Said rider contained this further provision: " It is further understood and agreed that in the event of any change or modification in the Company's schedule or supplement affecting the Service Charge (Rates), which would operate to increase the cost of the service to the consumer, the Company shall notify the consumer upon the issuance of said new schedule or supplement of such change or modification in said Service Charge (Rates) and the consumer thereafter may at his option cancel said application or contract for service upon giving the Company three (3) days' written notice any time prior to the effective date of the said new schedule or supplement."

Among the terms and conditions imposed by the relator's new schedule of rates which became effective June 1, 1917, it was provided that there should be incorporated in all service agreements the following provision:

" 10. Service Charge (Rates), etc., Subject to Termination, Change or Modification.— The service charge (rates), terms and conditions, fixed herein, are subject to termination, change or modification through the issuance of any subsequent schedule or supplement in accordance with the Public Service Commission Law, under order or by permission of the Public Service Commission for the First District."

Upon the hearings before the Public Service Commission relative to the validity of the new schedule of rates and the right and power of the relator to make said schedule applicable to existing contracts, testimony was taken and opportunity offered to present facts and arguments with reference thereto. Several hearings were had and the proceeding resulted in the final order of February 25, 1918, requiring the relator to file a supplement to its schedule which became effective June 1, 1917, and virtually excepting from the operation of such schedule holders of contracts then outstanding and who, under said new schedule, were required to pay a greater rate for steam than that provided by their contracts. The views of the Commission were expressed in an opinion concurred in by a vote of all of the Commissioners present at a meeting held on said February 28, 1918. The grounds upon which the Commission based its decision, as indicated by said opinion, were as follows:

" 1. That the act of the New York Steam Company in canceling by its notice of May 28, 1917, contracts made in conformity with the schedule effective November 1, 1916, was unjust and unreasonable.

" 2. That the schedule of June 1, 1917, is unjust, unreasonable and unlawful in so far as it does not provide a separate classification for contracts in force on that date and made in conformity with the schedule effective November 1, 1916." (*Matter of New York Steam Co.*, 15 State Dept. Rep. 295, 317.)

As to the first ground, while the opinion does not suggest that its holding is in effect a fixing of rates, I think such is the result of the Commission's order. The notice of May 28, 1917, referred to as the first ground for the order, and held to be unjust and unreasonable, certainly did not cancel nor did it purport to cancel the contracts made pursuant to the schedule effective November 1, 1916. The notice merely

advised the company's customers that a new schedule had been filed, and stated that after June 1, 1917, bills would be computed on the basis of proper rates applicable in each case to the particular class of service rendered. The customers were not complaining of the notice, but rather of the increase of rates which they were compelled to pay for the service which they obtained. The Commission's opinion argues that these contracts should be placed in a classification of their own and excepted from the application of the new schedule. The thing to be done by the filing of a supplemental schedule, as required by the Commission, would be to keep alive the unexpired contracts, thereby enabling relator's customers holding such contracts to obtain service at rates lower than the new schedule established and lower than new customers would be compelled to pay. The Commission does not claim that the contract rights theretofore in effect were abrogated by the new schedule. By giving effect to relator's action, but one set of rates was in existence at any time. The effect of the order of the Commission is to establish another and different set of rates applicable to the contract customers in question, and the primary and direct effect of such order was to require the relator to carry such contracts into effect and furnish its steam to the contract customers at the rates provided by said contracts. The fundamental theory of the Public Service Commissions Law is that there shall be but one rate for the same service. If the relator should comply with the Commission's requirement the effect would be that the old rate must be re-established, whether or not it was a living rate. It seems to me that under section 85 of the Public Service Commissions Law, the power of the Public Service Commission is limited to determining and prescribing just and reasonable rates and charges to be enforced in a given case. And under section 85 the Commission, in fixing rates, is obliged to have regard to a reasonable return upon the capital actually expended by the public service corporation, and to the necessity of making reservations out of income for surplus and contingencies. The act of the Commission in the case at bar seems to have overlooked these plain requirements of the statute. The Commission expressly reserves the determination as to the

reasonableness of the rates and charges set forth in the relator's schedule effective June 1, 1917. Apparently without passing upon the reasonableness or unreasonableness of the new rates established and without regard as to whether the rates effective on November 1, 1916, were reasonable or not, said last-mentioned rates have been re-established upon the sole ground that they may not be changed with reference to contracts made during the life of such schedule. The relator presented evidence to show that the old rates were unreasonable and afforded no reasonable return upon the capital invested, and were insufficient to provide the reservations for surplus and contingencies provided by the statute. The Commission, indeed, does not now question the reasonableness of the new rates, but merely holds that the outstanding contracts made under the schedule effective November 1, 1916, must be performed by the relator.

The Public Service Commission is a body of limited powers, and can only do that which the statute specifically prescribes it may do. It has no equity jurisdiction, and no powers beyond those given it by the statute may be exercised by said Commission. (*People ex rel. Delaware & Hudson Co.* v. *Stevens,* 134 App. Div. 99, 103; *People ex rel. Kelly* v. *Public Service Commission,* 171 id. 810.)

Its duties are purely administrative. The Commission has no judicial functions to discharge. It has power to regulate the service rendered by the relator and, within the statute, may govern prices to be charged for service rendered. It has no power to enforce its acts, or to restrain violations of law. At most, it can direct the attention of the Supreme Court thereto. It, of course, has no power to impose or collect fines. (*Mississippi Railroad Commission* v. *Illinois Central Railroad,* 203 U. S. 335, 341; *Venner* v. *New York Central & H. R. R. R. Co.,* 177 App. Div. 296, 342.)

The Commission is powerless to discharge the functions of a court of equity. But, nevertheless, in the present instance, the Commission has exercised equity jurisdiction and has attempted to compel the relator to perform its contracts according to their terms. Assuming that the relator may be compelled to perform such contracts, and that the Commission is essentially right in holding that an establishment

of rates which in effect may abrogate outstanding contracts is inequitable, that matter can only be determined and performance enforced through the decree of a court of equity.

But aside from the aforesaid considerations, it seems to me that the plain effect of the action of the Commission is to fix a rate to be charged by the relator as to outstanding contracts which is clearly discriminatory, if the new schedule of rates is left applicable to all other business of the relator. The statute provides that: " * * * No corporation or municipality shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable to such services as specified in its schedule filed and in effect at the time; * * * nor to extend to any person or corporation any form of contract or agreement, or any rule or regulation, or any privilege or facility, except such as are regularly and uniformly extended to all persons and corporations under like circumstances." (Pub. Serv. Com. Law, § 80, subd. 10.)

Seeking to comply with the plain provision of the statute above quoted, the Commission attempts to create a separate class of consumers to be made up of holders of contracts unexpired at the time when the new schedule went into effect, and that, therefore, they are entitled to receive the service at a different rate than new customers, who are governed by the new schedule. To uphold such an attempted classification, the Commission holds that service contracts may be made at different rates with different classes of consumers, where essentially different conditions and circumstances exist; and that there is an essential difference between the service rendered to the holders of these outstanding contracts, which cover annual and summer power consumers and who contract for a minimum monthly consumption, and other customers who contract generally and not upon the basis of a minimum monthly consumption, and who merely use what they want and pay for what they take, inasmuch as for such service the company must at all times be in readiness to furnish its steam at some burden to the company, which may be called upon to furnish steam at a time when its requirements upon it are at the peak of the load, as it is sometimes expressed

800   People ex rel. New York Steam Co. *v*. Straus.

First Department, March, 1919.          [Vol. 186.

or at a time of greatest call upon it.  The Commission argues that, therefore, a different rate should be given to the annual and summer consumers than that to consumers who may require steam at any time.  There is, of course, reasonable ground for making such distinction, and by the rates established by the relator such distinction is recognized, the summer users and those using steam under a monthly minimum being placed in separate classes from other users.  But such classification does not support the contention that special rates established by contract cannot be altered by later schedules establishing different rates for the same service.  Therefore, the Commission attempts to erect another classification based, not on conditions of service, but on conditions of contract.  The Commission contends that such contracts classify their holders because of the fact that they are sure of service for a definite term under their contracts, and that said contracts may not be abrogated because of the reason that the holders constitute a distinct class.  The Commission holds that abrogation destroys such class.  The effect of all this is that the Commission argues that the holders of time contracts based upon different conditions and kinds of service and upon lower rates than apply to customers who do not hold such contracts, constitute a distinct class, and that the reason of such distinction lies in the fact that the contracts cannot be abrogated, and the contracts cannot be abrogated  ecause the holders constitute a distinct class.  Thus it will be seen that the Commission, in order to uphold its position argues in a very small circle.  The law permits a classification based upon difference of circumstances and conditions of service, and no other classification, it seems to me, can properly be made.  The classification which the Commission attempts to make is arbitrary in the extreme.  The difference in rates which would result from such a classification is not based upon the quality of the service charged for, but upon the outside circumstances of the existence of agreements between the relator and customers made in conformity to a schedule of rates effective at the time the agreement was made, and that such rates do not conform to the new schedule.  Such attempted classification can have no reasonable basis, and in no way does it meet the inhibition of the statute forbidding

a public service corporation from directly or indirectly by special rate, rebate, drawback or other device or method to charge, demand, collect or receive from any person or corporation a greater or less compensation for service rendered than it charges, demands, collects or receives from any other person or corporation for doing a like and contemporaneous service under the same or similar circumstances or conditions.

The law is well settled that an unexpired contract does not authorize a public service company to charge a less rate for service rendered than that prescribed by effective schedules. The Federal and State courts have clearly and uniformly held such to be the law. (*Armour Packing Co.* v. *United States,* 209 U. S. 56; *Louisville & Nashville R. R.* v. *Mottley,* 219 id. 467; *Portland Railway Co.* v. *Oregon Railroad Commission,* 229 id. 397; *Onondaga Golf & Country Club* v. *Syracuse & Suburban Railroad Co.,* 96 Misc. Rep. 213.)

The *Armour* case, above cited, it seems to me, is directly applicable to the question under consideration, and is a leading case where the question here involved has arisen. The Chicago, Burlington and Quincy Railroad Company had filed, published and posted, according to law, schedules fixing a rate of twenty-three cents per 100 pounds from the Mississippi river to the city of New York on packing house products in transit to foreign countries. On June 17, 1905, said railroad company contracted with the Armour Company to carry its products at the rate thus established until December 31, 1905. Thereafter and on August 6, 1905, new schedules were filed by the railroad company fixing a rate of thirty-five cents per 100 pounds for the same service. The railroad company and the Armour Company, believing that the contract, by its terms expiring December 31, 1905, survived said new rates, continued to ship the Armour Company's goods at the old rate. The Armour Company was indicted and convicted of receiving an unlawful concession. In affirming the conviction the United States Supreme Court said: "It is strongly urged that there is nothing in the acts of Congress regulating interstate commerce which can render illegal the contract between the shipper and the railroad company covering the period from June to December, 1905. The contract, it is insisted, was at the legal, published

and filed rate, and there is nothing in the law destroying the right of contract so essential to carrying on business such as the petitioner was engaged in. But this contention loses sight of the central and controlling purpose of the law, which is to require all shippers to be treated alike, and but one rate to be charged for similar carriage of freight, and that the filed and published rate, equally known by and available to every shipper. * * * There is no provision excepting special contracts from the operation of the law. One rate is to be charged and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute. * * *

" It may be, as urged by petitioner, that this construction renders impossible the making of contracts for the future delivery of such merchandise as the petitioner deals in, and that the instability of the rate introduces a factor of uncertainty, destructive of contract rights heretofore enjoyed in such property. This feature of the law, it is insisted, puts the shipper in many kinds of trade at the mercy of the carrier, who may arbitrarily change a rate, upon the faith of which contracts have been entered into. But the right to make such regulations is inherent in the power of Congress to legislate respecting interstate commerce, and such considerations of inconvenience or hardship address themselves to the law-making branch of the Government. *New Haven Railroad Company* v. *Interstate Commerce Commission,* 200 U. S. 399. It may be that such contracts should be recognized, giving stability to rates for limited periods; that the contracts being filed and published, and the rate stipulated known and open to all, no injustice would be done. But, as we have said, such considerations address themselves to Congress, not to the courts. It is the province of the judiciary to enforce laws constitutionally enacted, not to make them to suit their own views of propriety or justice.

" The statute being within the constitutional power of Congress, and being in force when the contract was made, is read into the contract and becomes a part of it.

" If the shipper sees fit to make a contract covering a definite period for a rate in force at the time he must be taken to have done so subject to the possible change of the published

rate in the manner fixed by statute, to which he must conform or suffer the penalty fixed by law."

It is thus held that the controlling purpose of such a law as that with which we have to do in the case at bar is that all shippers shall be treated alike, and that but one rate shall be charged for similar service, and that the law makes no distinction in favor of special contracts, nor does it exempt them from the operation of the statute. To use the words above quoted: " One rate is to be charged and that the one fixed and published in the manner pointed out in the statute, and subject to change in the only way open by the statute."

And the *Armour* case expressly holds that it is within the inherent power of the Legislature to pass a law which in effect may be destructive of contract rights, and over the exercise of such legislative prerogative the courts have no control.

In the case of *Louisville & Nashville R. R.* v. *Mottley* (*supra*) the same rule is followed. In the *Mottley* case the defendant and his wife were injured upon the plaintiff's railway in an accident occurring in the year 1871. They compromised their claim for damages and released the company under an arrangement whereby it was agreed that the Mottleys should have a free pass so long as they lived over ·every part of the plaintiff's railway. Apparently they enjoyed this privilege until when, in 1887, Congress passed an act providing that " If any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful." (24 U. S. Stat. at Large, 379, § 2.) In 1906 Congress passed an act which provided that every common carrier shall file, publish and post schedules showing all the rates, fares and charges for transportation, and which prohibited

any common carrier, unless otherwise provided, to charge, demand, collect or receive " a greater or less *or different* compensation " for such transportation of passengers or property than the rates, fares and charges specified in the tariff filed and in effect at the time.   The act of 1906 also provided that the common carrier shall not refund or remit in any manner or by any device any portion of the rates, fares and charges, so specified, or extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs. (34 U. S. Stat. at Large, 586, 587, § 2, amdg. 24 id. 380, 381, § 6.)

Under such act of Congress the court held that it was obligatory upon the railroad company thereafter to charge the Mottleys the same scheduled rates for transportation as they charged the public generally, and that the contract between the company and the Mottleys was subject to regulation by Congress.

In the case of *Onondaga Golf & Country Club* v. *Syracuse & Suburban Railroad Co.* (*supra*) an agreement was entered into between the members of the Onondaga Golf and Country Club and the railroad company that the latter should carry the members of the club at a fifteen-cent rate for round-trip tickets.  This contract was made in 1900, and subsequently the Public Service Commissions Law was enacted by the State Legislature and the railroad company filed a schedule showing a twenty-five-cent round-trip rate to the public at large.   It was held that the filing of the new schedule abrogated the previous contract.

In each of these cases the voluntary act of the company in creating a new schedule pursuant to law abrogated the contract.  The cases in this State seem to have quite uniformly held along the same line that under statutes substantially like this now under consideration a common carrier may not transport freight or passengers at a lower rate than that established by the schedules adopted and published by such company. (*Pennsylvania Railroad Co.* v. *Titus*, 156 App. Div. 830; *Baltimore & Ohio Railroad Co.* v. *LaDue*, 128 id. 594.)

I am, therefore, of the opinion that the Public Service Commission was without equity jurisdiction to require the relator to furnish steam to those with whom it had contracted at the rates established by the schedule in effect on November 1, 1916.   In attempting to compel such performance on the

relator's part by requiring the filing of a supplemental schedule extending to such outstanding contracts a continuance of the rates existing at the time they were made, the Commission clearly arrogated to itself powers which the statute never intended to confer upon it. The exercise of such equity powers rests alone with the courts.

I am further of the opinion that even though the Public Service Commission possessed the equitable power which it assumed to exercise in the case at bar, it could not require the filing of a supplemental schedule the effect of which was to require the relator to charge a different rate for like service to one class of its customers than that charged to another. The attempted classification sought to be established by the Commission was arbitrary and based upon no facts or circumstances justifying the same. And for the reasons stated and upon the authorities cited, the Legislature having power to enact the statutes hereinbefore referred to, the filing of the new schedules abrogated the contracts in question. The logical result is that the provisions of the Public Service Commissions Law applicable to such contracts are to be read into and form a part thereof.

The writ should be sustained and the order annulled, with fifty dollars costs and disbursements.

CLARKE, P. J., LAUGHLIN, DOWLING and SMITH, JJ., concurred.

Writ sustained and order annulled, with fifty dollars costs and disbursements.