### INTERBOROUGH RAPID TRANSIT CO. v. GILCHRIST et al.

District Court, S. D. New York. May 2, 1928.

Supplemental Decree May 10, 1928.

**1. Courts ⬤═493(3)—Public service corporation, actually subjected to confiscatory limitation of rates, may seek injunctive relief in federal court, though proceedings are pending in state court.**

A public service corporation, which is being actually subjected to confiscatory limitations of its rates, whether imposed by an order of a regulatory state body or legislative act, even though there be pending in state court proceedings for the revision of the order, may seek injunctive relief from the federal court, particularly where it appears that it has done all it could under state law to obtain relief without success.

**2. Courts ⬤═282(3)—Rules of comity or convenience must give way to constitutional rights, in determining jurisdiction to enjoin confiscatory rates.**

In determining jurisdiction of proceedings to enjoin enforcing confiscatory rates against street railroad, rules of comity or convenience must give way to constitutional rights.

**3. Public service commissions ⬤═7—Denial of application for hearing as provided by statute amounts to confiscation, if rate is too low.**

Denial by Public Service Commission of an application by public utility for a hearing, where the statute provides therefor, amounts to confiscation, if the rate then in effect is too low.

**4. Municipal corporations ⬤═619—Public service commissions ⬤═7—Legislative grant of regulatory power over rates must be strictly construed.**

Grant of regulatory power over rates by Legislature to a commission or municipality must be strictly construed, and cannot be extended by inference.

**5. Corporations ⬤═391—Suspension of police power over public utility rates cannot be accomplished by implication.**

Suspension of police power over public utility rates cannot be accomplished by implication, and legislative authority to grant regulatory power must be plain, and intention must clearly and unmistakably appear.

**6. Municipal corporations ⬤═661(1)—Municipality's exercise of proprietary powers over streets is public.**

The exercise by a municipality of its proprietary powers over streets is public in its nature.

**7. Constitutional law ⬤═81—Police power is attribute of sovereignty, and primarily vested in Legislature.**

Police power is an attribute of sovereignty, and is primarily vested in the Legislature.

**8. Constitutional law ⬤═63(2)—State may authorize municipality to establish rates for public service corporation for definite term not grossly unreasonable in point of time.**

The state may authorize a municipality to establish by an inviolable contract the rates to be charged by a public service corporation for a definite term not grossly unreasonable in point of time, and the effect of such a contract is to suspend during life thereof governmental power of fixing and regulating rates.

**9. Corporations ⬤═391—Contract surrendering governmental power of regulating rates of public service corporation must be closely scrutinized.**

Surrender by contract of governmental power of regulating rates chargeable by public service corporation must be closely scrutinized, in that such a contract has effect of extinguishing pro tanto an undoubted power of government.

**10. Courts ⬤═282(3)—Federal courts have jurisdiction to protect public service corporations against confiscation by unreasonable rates.**

Federal courts have jurisdiction to protect public service corporation against confiscatory rates, on failure of Public Service Commission to act after rates become unreasonable, because noncompensatory or because excessive.

**11. Courts ⬤═366(1)—Federal courts must look to decisions of state courts in construing and giving effect to state statute.**

In construing and giving effect to provisions of state statute, federal courts must look to decisions of highest appellate court of the state.

**12. Constitutional law ⬤═135—Changing contract rate of public utility under state regulatory plan does not impair contract rights.**

Changing a contract rate chargeable by public utility pursuant to state regulatory plan does not impair contract rights under the federal Constitution.

**13. Corporations ⬤═391—Renunciation of sovereign right to prevent excessive charges by public service corporations must be clearly evidenced.**

The renunciation of a sovereign right to prevent excessive charges by public service

corporations must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction.

**14. Carriers ⬳12(9)—Contract authorizing specified fare chargeable by street railroad held subject to regulatory power of Public Service Commission in accordance with law in effect at date of its execution (Public Service Commission Law N. Y. §§ 26, 49).**

Provisions of contract authorizing street railroad to charge a certain rate, executed at time New York Public Service Commission Law (Consol. Laws, c. 48) was in effect, held subject to regulatory power of Public Service Commission pursuant to section 49, as effectively as though written in contract, and rate specified therein became subject to commission's regulation on becoming unjust and unreasonable, within express provision of section 26, forbidding charging or collecting unreasonable rates.

**15. Constitutional law ⬳298(2)—Rate permitting return of 2.65 per cent. in 1926 and 2.52 per cent. in 1927 held confiscatory, in violation of due process clause (Const. Amend. 14).**

Rate allowed street railroad, permitting an actual earned return of 2.65 per cent. in 1926 and 2.52 per cent. in 1927, held confiscatory, so as to amount to a taking of property without due process of law, in contravention of Fourteenth Amendment of the Federal Constitution.

**16. Constitutional law ⬳298(1)—Determination of fairness of rate within constitutional guaranty depends on present value of property used.**

Determination of what rate should be prescribed for public utility, so as to yield a fair and reasonable return, within constitutional guaranty, depends on present value of property used.

**17. Carriers ⬳12(5)—Property of city leased to street railroad must be considered in calculating capital for purpose of determining reasonable rate.**

In calculating capital of street railroad for purpose of determining fair and reasonable rate, property belonging to city and leased to carrier must be considered, as well as property owned by carrier.

**18. Constitutional law ⬳298(1)—Denial by Public Service Commission of change of confiscatory rate constituted denial of due process (New York Public Service Commission Law; Const. Amend. 14).**

Since contract establishing rates chargeable by street railroad was subject to regulatory power of Public Service Commission, because of fact that it was executed at time when New York Public Service Commission Law (Consol. Laws, c. 48) was in effect, denial by commission of a change of confiscatory rate of fare held to amount to a denial of due process, under Const. Amend. 14.

**19. Courts ⬳282(3)—Public service corporation, establishing claim of confiscation, is entitled to injunctive relief in federal court.**

Public service corporation, having established claim of confiscation of its property by reason of imposition of confiscatory rate, is entitled to injunctive relief in federal court.

26 F.(2d)—58

**20. Courts ⬳282(3)—Federal court takes jurisdiction of proceedings to enjoin confiscatory rates, not as matter of discretion or comity, but as matter of duty.**

Federal court takes jurisdiction of proceeding to enjoin confiscatory rate imposed on public utility, not as matter of discretion or comity, but as a matter of duty, since federal court, when appealed to in protection of constitutional rights over which it has by law jurisdiction, may not avoid assuming jurisdiction therein.

In Equity. Suit by the Interborough Rapid Transit Company against J. F. Gilchrist and others, constituting the Transit Commission, the same being the Metropolitan Division of the Department of Public Service of the State of New York, and others. On motion for an injunction pendente lite. Injunction granted.

See, also, 25 F.(2d) 164.

James L. Quackenbush, of New York City (William L. Ransom and Jacob H. Goetz, both of New York City, and Harry L. Butler, of Madison, Wis., of counsel), for plaintiff.

George P. Nicholson, Corp. Counsel, of New York City (Charles L. Craig, Joseph A. Devery, Edgar J. Kohler, and M. Maldwin Fertig, all of New York City, of counsel), for defendant city of New York.

Clarence M. Lewis, of New York City (Samuel Untermyer, Irwin Untermyer, Robert S. Johnstone, C. D. Williams, and G. H. Stover, all of New York City, of counsel), for defendant Transit Commission.

Murray, Aldrich & Roberts, of New York City (William Roberts, of New York City, of counsel), for defendant Manhattan Ry. Co.

Before MANTON, Circuit Judge, and KNOX and BONDY, District Judges.

MANTON, Circuit Judge. The original bill in this suit was filed in the forenoon of February 14, 1928. It seeks to restrain the members of the transit commission of the metropolitan division of the department of public service of the state of New York, from enforcing various rate limitations, restricting the rate of fare charged by the plaintiff on its rapid transit railways, operated in the city of New York, to 5 cents per passenger, upon the theory that such limitations have become confiscatory under the Fourteenth Amendment to the federal Constitution. It asks that they be restrained from interfering with the plaintiff, which proposes to charge 7 cents per passenger, or such other fare in excess of 5 cents as is not confiscatory. The court is asked to restrain the transit commission from carrying out threats to do various things which deny to the plaintiff its day in court,

for an adjudication of its rights as to rates, and from attempting to obstruct and defeat steps taken by the plaintiff from time to time, which it claims it is authorized to do under the statutes, to obtain relief from the alleged confiscatory 5-cent fare.

After this suit thus commenced, and on the same day, the transit commission and the city of New York, in three suits in the New York state courts, asked for injunctive relief in substance requiring the plaintiff to charge but 5 cents for each passenger and to restrain it from carrying out its proposed increase of fare per passenger. On February 17, 1928, the plaintiff filed an ancillary complaint in this court, praying that the defendants be enjoined and restrained from further prosecuting or causing prosecution of their respective suits in the state court, and restraining them from in any wise interfering with the prosecution of the original action in this court. A judge of the District Court granted an order (25 F.[2d] 164) which enjoined and restrained the defendants from further prosecuting the suits in the Supreme Court of the state. An application was made and granted for convening a court of three judges, pursuant to section 380 of the United States Code (28 USCA § 380).

[1, 2] A public service corporation which is being actually subjected to a confiscatory limitation of its rates, whether that be imposed by an order of a regulatory state body or an act of the Legislature, even though there be pending in the state court proceedings, for the revision of the order, may seek injunctive relief from a federal court, when it appears that it is suffering daily from confiscation under the rate to which it is limited, and particularly where it appears that it has done all it could under the state law to obtain relief without success. Springfield Gas & El. Co. v. Barker (D. C.) 231 F. 331, 335; Love v. A. T. & S. F. R. R. Co. (C. C. A.) 185 F. 321, 324. Rules of comity or convenience must give way to constitutional rights, and there is no doubt of the duty of a District Court to take and retain jurisdiction. Oklahoma Gas Co. v. Russell, 261 U. S. 290, 293, 43 S. Ct. 353, 67 L. Ed. 659; Monroe Gaslight Co. v. Michigan Public Utilities Co. (D. C.) 292 F. 139.

The suit is here upon causes of action stated in the complaint and supported by affidavits, to which answers are filed with accompanying affidavits in opposition. It is alleged generally that the transit commission and the city of New York are enforcing various rate limitations imposed by the Legislature, and by acts legislative in character, of the state of New York, restricting the rate of fare charged by the plaintiff on each of the elevated lines and the subway divisions of the rapid transit railways operated by the plaintiff within the city to 5 cents per passenger, in breach of the Fourteenth Amendment of the Constitution, because such limitations have become confiscatory.

Relief is sought (a) from limitation imposed by legislative acts of the state of New York (chapter 743 of the laws of 1894) upon rates chargeable on the elevated railroad lines operated by the plaintiff, which are in large part owned by the Manhattan Railway Company, and are now operated under lease by the plaintiff; (b) from the rate provision in a certain elevated railroad extension certificate of March 19, 1913, granted by the Public Service Commission for the First District, acting in behalf of the city of New York, to the plaintiff, and to permit the plaintiff, in conformity with and in pursuance of the Public Service Commission Law and the powers conferred and delegated to it by the Legislature, including the plaintiff's tariff schedules, to establish an increase in fare chargeable by the plaintiff on the elevated lines and to secure a determination by the regulatory authority of the state; (c) as to limitations imposed by the Legislature, or acts legislative in character, of the state of New York, including the plaintiff's tariff schedules on the rates chargeable on the subways of the rapid transit railroads operated by the plaintiff, which it owns in part and which are in part owned by the city, and also the rate provision in contract No. 3, herein referred to, made March 19, 1913, between the plaintiff and the Public Service Commission of the state of New York for the First District, acting in behalf of the city for rapid transit railroad extensions within the city, in accordance with the steps taken by the plaintiff in conformity with and pursuant to the provisions of the Public Service Commission Law and the power and authority conferred upon and delegated to it by the Legislature to establish an increase in fare chargeable on the subway divisions and to secure a determination by this regulatory authority of the state.

Relief is sought, not only as to fare chargeable on the elevated and subway divisions of the rapid transit railways operated by the plaintiff, considered as separate unified systems under the legislation and acts legislative in character, but also upon all the rapid transit railways considered as a unified operation under the legislation and acts legislative in character and under the elevated ex-

tension certificate and contract No. 3 for rapid transit railroad extensions of March 19, 1913.

[3] The ancillary bill filed makes clear the denial, by the commission, of a hearing as asked when schedules were filed on February 1, 1928, and moreover that the defendants actively sought the aid of the state court in enjoining the plaintiff from proceeding to enforce its rates as provided in the schedules. It further appears in the original bill that two previous applications to the commission and its predecessors, asking for an increase in rate had met with denial, because the commission considered itself without jurisdiction or power to grant such relief. From this it is manifest that the commission intended never to accord the plaintiff a hearing on its application, whatever its merits might be. Denial of an application for a hearing, where the statute provides for such application, amounts to confiscation, if the rate be too low. Prendergast v. N. Y. Tel. Co., 262 U. S. 43, 43 S. Ct. 466, 67 L. Ed. 853.

The Rapid Transit Act, chapter 4, of the Laws of 1891 of the state of New York, entitled "An act to provide for rapid transit railways in cities of over one million inhabitants," provided for the appointment of rapid transit commissioners in such cities, and that "they shall have and exercise the specific authority and powers hereinafter conferred, and also such other and necessary powers as may be requisite to the efficient performance of the duties imposed upon the said board by this act." Section 4 provided for the determination of the necessity of railways, the fixing of routes, and the approval and consent of the common council, and section 6 provided that, when the consent of the local authorities and property owners had been obtained, the board was required to prepare detailed plans and specifications, including equipment and safety devices. Section 7 provided for the sale of the right, privilege, and franchise to construct, maintain and operate the railways, and the terms of sale "must also specify the amount of the capital of any such corporation, and number of shares of capital stock, * * * and the maximum rates of fares and freight which such corporation may charge and collect for the carriage of persons and property."

This act was amended by chapter 729 of the Laws of 1896, section 34 as added by c. 752 of the Laws of 1894, § 9, and amended by section 10, c. 519, of the Laws of 1895, so as to provide that, in case the people should determine that any railway shall be constructed for or at the expense of the

city, the board shall consider routes and plans previously adopted and proceed therewith, and that any contract for the construction of said route shall provide that the person or corporation so contracting shall, at his own cost and expense, equip, maintain, and operate the said routes or roads for a term of years, to be specified in the contract, for not less than 35 or more than 50 years, and upon "such terms and conditions as to the rates of fare to be charged and the character of service to be furnished and otherwise as said board shall deem to be best suited to the public interest, and subject to such public supervision and to such conditions, regulations and requirements as may be determined upon by said board."

By chapter 472 of the Laws of 1906, the board of rapid transit commissioners was reconstituted, so as to consist of the mayor, the comptroller, president of the Chamber of Commerce of the state of New York, and five persons named in the act, with vacancies to be filled by the mayor. The board so constituted had specific powers and duties therein provided for the "efficient performance of the duties imposed upon the said board by this act." By chapter 429 of the Laws of 1907 there was substituted for the act creating the rapid transit railroad commissioners the Publice Service Commission of five members of the First District to be appointed by the Governor. By section 5, subd. 6, of that act, the commissioners of the First district were given all powers theretofore conferred upon the board of rapid transit railroad commissioners under chapter 4 of the Laws of 1891, and the board of rapid transit railroad commissioners was abolished by section 83.

By chapters 343 and 350 of the Laws of 1926 (sections 431–433) the present transit commission was provided for, and the duties of the Public Service Commission and transit commission were transferred to it. By chapter 498 of the Laws of 1909 and chapter 504 of the Laws of 1910 various amendments were made to the Rapid Transit Act which are unimportant here.

Section 49 of the Public Service Commission Law (chapter 429 of the Laws of 1907) provides that, "whenever either commission shall be of opinion * * * that the rates, fares or charges demanded, exacted, charged or collected by any common carrier, railroad corporation or street railroad corporation subject to its jurisdiction for the transportation of persons, or property within the state, or that the regulations or practices of such * * * street railroad corporation affecting such rates are unjust, unreasonable,

unjustly discriminatory or unduly preferential, or in any wise in violation of any provision of law, or that the maximum rates, fares or charges, chargeable by any such common carrier * * * or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall * * * determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, * * * and shall fix the same by order to be served upon all common carriers * * * or street railroad corporations by whom such rates, fares and charges are thereafter to be observed." This may be done by complaint or upon the commission's own motion. By the same provision, the carrier is obliged to comply with and observe orders made by the commission as to rates of fare.

Plaintiff's subway division consists of lines which were constructed under contract No. 1, dated February 21, 1900, contract No. 2, dated July 21, 1902, and contract No. 3, dated March 19, 1913. Contracts No. 1 and No. 2 were made prior to the act creating the Public Service Commission and the effective regulatory power granted under section 49 thereof. Contract No. 1 was made by the board of rapid transit commissioners, on behalf of the city of New York, with John B. McDonald for the construction by him, at the expense of the city, and for lease to him for operation for a term of years, of a subway known as the Manhattan-Bronx Rapid Transit Railroad through the east side of Manhattan Island to the Bronx. He agreed to equip, maintain, and operate the same. During the term, such equipment was to be supplied as his property subject to the city's right of repurchase at the end of the term. That contract from time to time was modified and supplemented.

Contract No. 2 was made by the board of rapid transit commissioners on behalf of the city of New York, with the consent and approval of the board of estimate and apportionment of the city of New York, with the Rapid Transit Subway Construction Company, for the construction by it at the expense of the city, for lease to it for a number of years of a certain railway known as the Brooklyn-Manhattan Rapid Transit Railroad, connecting the southern end of the Manhattan-Bronx Railroad, so as to form a continuous railway over the route running southerly from the post office in the borough of Manhattan under the East River and to the Flatbush Avenue station of the Long Island Railroad in Brooklyn, with an agreement on its part to equip, maintain, and operate the same during the said term. The equipment so supplied was to be the property of the contractor, subject to the city's right to purchase at the end of the term. This contract was likewise modified and supplemented from time to time.

On July 10, 1902, and August 10, 1905, McDonald and the Rapid Transit Subway Construction Company, respectively, assigned, with the consent of the board of rapid transit commissioners, to the plaintiff so much of the No. 1 and No. 2 contracts as applied to the lease of the railways. On July 11, 1911, so much of contract No. 1 as applied to the construction was duly assigned to the Rapid Transit Subway Construction Company. On January 30, 1913, so much of contracts No. 1 and No. 2 as applied to construction were respectively assigned to the plaintiff.

Contract No. 1 contained an agreement for lease by the city to the contractor for a term of 50 years, at a rental of an annual sum equal to the annual interest payable by the city upon all bonds which it should issue in order to provide means for construction, and a further annual sum equal to 1 per cent. upon the whole amount of the bonds, with certain abatements during the first 10 years. Contract No. 2 contained an agreement for leasing, by the city to the contractor, at a rental consisting in general of an annual sum equal to the annual interest payable by the city upon all bonds issued by it in order to provide means for construction, an annual sum equal to 1 per cent. of the whole amount of the bonds, with certain abatements during the first 10 years, and a further annual sum equal to the amount of the annual interest payable by the city upon bonds issued to provide means to pay for the acquisition of rights of way.

On March 19, 1913, the city, acting by the Public Service Commission for the First District, entered into a contract with the plaintiff for the construction by the city, and the equipment, maintenance, and operation by the plaintiff, of rapid transit railways along the routes known as Seventh Avenue-Lexington Avenue line, Eastern Parkway line, Steinway Tunnel line, and White Plains Road line. The contract provided for the construction by the city, under separate construction contracts, a contribution by the plaintiff toward the cost of the construction and the equipment of the railway by the plaintiff at its own expense and for a lease by the city

of the railway and equipment to the plaintiff for operation in conjunction with the existing railways and existing equipment provided for in contracts No. 1 and No. 2 "for a single fare * * * of 5 cents but no more" for a term beginning January 1, 1917, and expiring December 31, 1965—subject, however, to earlier termination as therein provided. The original terms of contracts No. 1 and No. 2 were modified as to the expiration of the lease and in other particulars.

By the terms of contract No. 3, it was provided that the plaintiff should pay as long as the existing railroads were operated in conjunction with the new extensions, an additional rental to that contained in contracts No. 1 and No. 2. In consideration of the operation of the railways and existing railway in conjunction with each other for a single fare, and of the contribution by the plaintiff to the cost of construction of the railways and of the agreements to modify the terms of contracts No. 1 and No. 2, upon the commencement of the operation of the portions of the railway specified in the contracts, the gross receipts, from whatever sources derived, directly or indirectly, by the plaintiff in connection with the operation of railways and the existing railways during the term of the contract, were to be disbursed to meet obligations therein specified, after which the city and plaintiff shared the balance in equal parts.

Contracts No. 1 and No. 2 provided for a single fare in the sum of 5 cents, but no more. Contract No. 3 in its terms superseded the provisions of contracts No. 1 and No. 2 as to the rate of fare. It provided for a single fare over the entire system of the railways to be built and the existing railways of "5 cents, but not more."

The Manhattan Railways Company, incorporated under the provisions of the Rapid Transit Act (chapter 606 of the Laws of 1875), was authorized to construct, maintain, and operate elevated railroads along routes laid out and designated by the rapid transit commission under the authority of that act. It was engaged as a common carrier for many years, and owned elevated rapid transit railways lying within the city of New York, and leased them to the plaintiff, which operated them as part of its general system. The lease, dated January 1, 1903, was for a period of 999 years, and as a rental the plaintiff guaranteed interest on mortgage bonds, paid a cash rental, and guaranteed 7 per cent. dividends on $60,000,000 of the Manhattan Railway Company's stock, and this lease was effective when, on March 19, 1913, by the terms of contract No. 3, the elevated extension certificates were provided for.

The routes under the certificate to the Manhattan Railway Company were formally added to the property leased to the plaintiff for operation. The certificates granted to the plaintiff provided for (1) elevated railroad extensions and (2) additional tracks, and that the plaintiff was entitled to charge a single fare, for each passenger, for one continuous trip in the same general direction of 5 cents, but not more. The additional contract certificate of the same date, granted to the Manhattan Railway Company, contained no provision fixing a rate of fare to be charged thereon.

The Rapid Transit Act was amended in 1912 (chapter 226, subd. 3, § 8, Laws of 1912) so as to give additional authority for contract No. 3. Section 7 of the original act had long provided that the contract should contain such terms and conditions as to rates of fare to be charged as said commission shall deem to be best suited to the public interest. This provision was part of the act several years before 1907 when the Public Service Commission Law was adopted. The extension certificate was granted under the authority of section 34 of the Rapid Transit Act (as amended by chapter 752 of the Laws of 1894), and it is not claimed to have been given by the amendment of 1912, but it is claimed to have the authority of section 32-a enacted by chapter 472 of the Laws of 1906, adopted one year before the Public Service Commission Act.

The section did not authorize the commission to condition an extension certificate upon a stipulation as to fare. It (section 34) designates the subjects to be embraced in the certificate, but without reference to fare provisions. This challenges legislative purposes to authorize the insertion or making of a fare provision of any kind. Prior to 1894, no provision of fare of any kind below 10 cents and no restriction upon fares had been imposed by legal authorities as a condition of constitutional consent. Ten-cent limitations were statutory. By chapter 743 of the Laws of 1894, the 5-cent limitation was established, unless the extension certificate of March 19, 1913, or the resolution of the board of estimate, formally approving the proposed certificate, and consenting to the construction and operation of the extensions in accordance therewith, be a constitutional consent to a different fare.

We hold that the 5-cent limitation as to the elevated railway company is statutory under chapter 743 of the Laws of 1894. The

resolution, even if treated as a consent of the legal authority under section 18, art. 3, of the Constitution of the state, is ineffective to create any contractual fare limitation, because section 34 of the Rapid Transit Act provided only for such consents as were necessary to be fulfilled in such cases of extensions under section 18 of art. 3, which by no means required fare regulations, but only consent to construct and operate. Under authoritative decisions of the state of New York, where consents were granted after July 1, 1907 (the effective date of the Public Service Commissions Law), municipalities were precluded from conditioning their consent upon a fare provision which should be exempt from the application of the Public Service Commission Law. People ex rel. City of New York v. Nixon, 229 N. Y. 356, 128 N. E. 245.

A provision for fare in contract No. 3, as such, does not apply to elevated railways. The phrase of the certificate that the fare limitations shall apply to one continuous trip in the same general direction over the railways (which are defined as including only additional tracks and the extension of certain trackage rights provided for by the certificate) of the Manhattan Railway express service, indicates an intent that the fare shall apply to the latter only where the trip is, in whole or in part, over the railways, and should not be applicable to trips originating and ending on the lines of the then existing Manhattan Railway Company. No fare provision is embraced in the additional contract certificate granted to that company on the same day, which lends support to the same view.

[4, 5] The grant of the regulatory power over rates by the Legislature to a commission or municipality must be strictly construed, and must not be extended by inference. The suspension of police power over rates cannot be accomplished by implication. The legislative authority must be plain, and the intention must clearly and unmistakably appear. Home Tel. & Tel. Co. v. Los Angeles, 211 U. S. 273, 29 S. Ct. 50, 53 L. Ed. 176.

The provisions of contracts No. 1 and No. 2 as to fares were superseded by the provisions of contract No. 3 providing for a rate of fare to be charged in the operation of new and existing railroads as one completed system. Article 1 of contract No. 3 provided that the new subway lines shall be operated in conjunction with the old for a single fare and in accordance with the contract. The terms of contract No. 3 specifically modified and changed the provisions of contracts No.

1 and No. 2 so as to provide a single fare; it extended the ride over the entire system and for a fare of 5 cents and no more. The railroad is being presently operated under contract No. 3, at least so far as the fare charged is concerned.

The state Court of Appeals, in considering the validity and power to make the contract, has construed No. 3 to supersede the leases of contracts No. 1 and No. 2, saying: "But by the proposed contract [No. 3] this lease is to be modified and superseded by a new agreement whereby the city becomes reinvested with a substantial control thereof and relets them in connection with its new subways under one contract for operation as a single and entire system." Admiral Realty Co. v. City of N. Y., 206 N. Y. 110, 133, 99 N. E. 241, 247 (Ann. Cas. 1914A, 1054). It is not, as argued, merely a continuation and extension, supplementary of contracts No. 1 and No. 2. Comparing contracts No. 1 and No. 2 with No. 3 makes it clear that there were many modifications as to rentals payable to the city under contracts No. 1 and No. 2. In No. 3 a single fare was intended to be operative, not only over the lines covered by No. 1 and No. 2, but over the new subway and during the longer life of the contract. The fare provisions of No. 1 and No. 2 could not be continued in effect since each was intended to apply to a different period and had a different scope of operation. Therefore the fare provisions of the three contracts could not stand together, because they apply to different things. Contract No. 3 was a modification and a waiver of fare provisions of contracts No. 1 and No. 2.

[6] If plaintiff's right to charge a fare in excess of 5 cents—assuming that rate to be confiscatory—were to be determined solely upon the provisions of contracts No. 1 and No. 2, which were made pursuant to specific authority granted by the state Legislature to the board of rapid transit commissioners to contract for a 5-cent fare, and were such determination to be unaffected by the enactment of the Public Service Commission Law in 1907, and the execution of contract No. 3, the plaintiff would not now be entitled to judicial relief. In such case, only by securing the waiver of the contract rates by an authoritative commission speaking for the state would the railway company have any standing to ask for a change of rates in excess of the contract provision. Columbus Power & Light Co. v. City of Columbus, 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648; St. Cloud Pub. Service Co. v.

City of St. Cloud, 265 U. S. 352, 44 S. Ct. 492, 68 L. Ed. 1050.

But, when contract No. 3 was made, the Public Service Commission Law had been in force and effect since 1907, and the fare provisions of that lease are subject to regulatory revision in the manner prescribed by the Public Service Commission Law. The Rapid Transit Act, which was a special city law (Admiral Realty Co. v. City of New York, 206 N. Y. 110, 140, 99 N. E. 241, Ann. Cas. 1914A, 1054), provided that the rapid transit lines shall be a part of the system of street and highways of the city, and the contract declared it to be a matter of public interest. The exercise by a municipality of its proprietary powers over streets is public in its nature. Contract No. 3 was made in the presence of and with knowledge of the Public Service Commission Law, which law the authoritative decisions of the New York courts have held was a new and comprehensive policy of state-wide regulation and which was in terms applicable to rapid transit railways.

Contract No. 3 must be regarded as qualified by the existing restrictions of the Public Service Commission Law, which, among other things, expressly required that rates should be just and reasonable and expressly prohibited rates which should be unjust and unreasonable, whether excessive or because noncompensatory, and it expressly provided that rates not conforming to this legislative standard should be unlawful, and it empowered railway carriers to change rates by filing and publishing tariffs in order to conform to the standard, and imposed the duty, as well as conferred the power, upon the commission to apply and enforce the standard upon application of the utilities as well as of the public under sections 26 and 49 of the Public Service Commission Law. For effect and construction of this act by the state Court of Appeals, see People ex rel. City of New York v. Nixon, 229 N. Y. 356, 128 N. E. 245; People ex rel. Garrison v. Nixon, 229 N. Y. 576, 128 N. E. 255; Town of North Hempstead v. Public Service Corp., 231 N. Y. 447, 132 N. E. 144; Public Service Comm. v. Pavilion Natural Gas Co., 232 N. Y. 146, 133 N. E. 427; Evens v. Public Service Comm., 246 N. Y. 224, 158 N. E. 310; People ex rel. N. Y. Steam Co. v. Straus, 186 App. Div. 787, 174 N. Y. S. 868, affirmed 226 N. Y. 704, 123 N. E. 884; International Railway Co. v. Public Service Comm., 226 N. Y. 474, 124 N. E. 123.

The public policy of the state of New York in its regulatory power over utilities was announced in People ex rel. City of New York v. Nixon, 229 N. Y. 356, 358, 128 N. E. 245, by the Chief Judge, speaking for a unanimous court, as follows:

"At the date of this franchise, the Public Service Commission was empowered by statute to increase 'the maximum rates, fares, or charges chargeable by any * * * street railroad corporation' when found to be inadequate to yield a fair return (section 49, Public Service Commission Law; Consol. Laws, chap. 48). That power came to the commission through the amendment of the Public Service Commission Law in June 1911 (Laws 1911, c. 546; People ex rel. Ulster & Del. R. R. Co. v. Public Service Commission, 171 App. Div. 607 [156 N. Y. S. 1065], and 218 N. Y. 643 [112 N. E. 1071]), if it did not already exist under the law as first enacted in 1907 (Laws 1907, c. 429, § 49. Cf. the statutes construed in People ex rel. Village of South Glens Falls v. Pub. Service Comm., 225 N. Y. 216, 223 [121 N. E. 777]; People ex rel. N. Y. Steam Co. v. Straus, 186 App. Div. 787, 793 [174 N. Y. S. 868], and 226 N. Y. 704 [123 N. E. 884], and Arlington Board of Survey v. Bay State Street Ry. Co., 224 Mass. 463 [113 N. E. 273, 5 A. L. R. 24]).

"Contracts fixing rates, if made before the enactment of these statutes, were subject at the utmost to the possibility of the exercise by the state of its police power in the future. Contracts made thereafter were subject to a possibility which had become merged in a reality. It was no longer a question of what the state might do at some indefinite and unknowable time. It was a question of what the state had already done, drawing upon sources of energy, reserves of power, till then latent and potential, and manifesting its will in law. A new public policy had been initiated. A new right had been declared. Rates were thereafter to be just and reasonable, alike for carriers on the one side and for passengers or shippers on the other. Neither class would be permitted for its own benefit to set the rule at nought. The state, through its delegate, the commission, would lower the charges if too high. It would raise them, if too low. People ex rel. N. Y. Steam Co. v. Straus, supra; Arlington Board of Survey v. Bay State Street Ry. Co., supra; Postal Tel.-Cable Co. v. Associated Press, 228 N. Y. 370, 375 [127 N. E. 256]; Armour Packing Co. v. U. S., 209 U. S. 56 [28 S. Ct. 428, 52 L. Ed. 681]; Union Dry Goods Co. v. Georgia Pub. Service Corp., 248 U. S. 372 [39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420].

"Rate-making was to be no longer an af-

fair of predominantly private interest, in which the state would interfere without system and with spasmodic and intermittent action. A superintending agency of government had taken the matter in hand.

"The question soon arose whether the new rule was retroactive, and annulled existing contracts in conflict with its terms. Indisputably it annulled such contracts between carriers and passengers, or carriers and shippers. Louisville & Nashville R. R. v. Mottley, 219 U. S. 467 [31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671]; People ex rel. N. Y. Steam Co. v. Straus, supra; Postal Tel.-Cable Co. v. Associated Press, supra; Producers' Transp. Co. v. R. R. Comm., California, 251 U. S. 228 [40 S. Ct. 131, 64 L. Ed. 239]. 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject-matter.' Hudson County Water Co. v. McCarter, 209 U. S. 349, 357 [28 S. Ct. 259, 52 L. Ed. 828, 14 Ann. Cas. 560]; Union Dry Goods Co. v. Georgia P. S. Corp., supra, p. 375 [39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420]."

Later, in Town of North Hempstead v. Public Service Corporation of Long Island, 231 N. Y. 447, 450, 132 N. E. 144, the court said, speaking of the provisions of the Public Service Commission Law:

"These provisions were in force when the plaintiff gave its consent to the defendant to maintain and operate its gas mains within the town, entered by implication into the terms of such consent, formed part of its obligation, and were notice to the town that the consent was coupled with the provision of the statute that the defendant was empowered to abrogate it as to the rates stipulated therein and was allowed by law to put into operation a new schedule of just and reasonable rates and charges to be made for service."

[7-11] The police power is an attribute of sovereignty and is primarily vested in the Legislature. The state may authorize a municipality to establish by an inviolable contract the rates to be charged by a public service corporation for a definite term not grossly unreasonable in point of time, and the effect of such a contract is to suspend, during the life of the contract, the governmental power of fixing and regulating the rates. The surrender by contract, however, of this governmental power, as well as the authority to make it, must be closely scrutinized for such a contract has the effect of extinguishing pro tanto an undoubted power of government; both its existence and authority to make it must clearly and unmistakably appear and all doubts must be resolved in favor of the continuance of the power. Home Tel. & Tel. Co. v. Los Angeles, 211 U. S. 265, 273, 29 S. Ct. 50, 53 L. Ed. 176.

If the parties have not thus agreed to a 5-cent fare, when that fare becomes unreasonable, because it is noncompensatory or because it is excessive, the contract furnishes no obstacle to the exercise of jurisdiction by the Public Service Commission, and when it fails to act there is jurisdiction in the federal courts to protect the corporation against confiscation. Southern Iowa El. Co. v. Chariton, 255 U. S. 539, 41 S. Ct. 400, 65 L. Ed. 764; City of San Antonio v. San Antonio Pub. Service Co., 255 U. S. 547, 41 S. Ct. 428, 65 L. Ed. 777; City of Houston v. Southwestern Bell Tel. Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961; Chicago v. O'Connell, 278 Ill. 591, 116 N. E. 210, 8 A. L. R. 916; City of St. Louis v. Public Service Comm.; 276 Mo. 509, 207 S. W. 799.

We find nothing in the amendment of the Rapid Transit Act in 1912 which excludes the plaintiff from the application of the regulatory plan and that act contains no clear and unmistakable evidence of effort to delegate to the city authority to establish by contract in 1913 unchangeable rates to be charged by the plaintiff. While contract No. 3 provides for a 5-cent fare to be charged in 1913, there is no delegation in any part of the act of the regulatory power of the state Legislature. Nor was the Public Service Commission Law on the subject of regulation in any wise changed. An intention of the parties that the rates then in question should be subject to modification under the Public Service Commission Law was not affirmatively expressed, but the state courts have announced that there must be read into the contracts made after 1907 the authoritative regulation provided for by the Public Service Commission Law. People ex rel. Garrison v. Nixon, 229 N. Y. 576, 128 N. E. 255.

If these regulatory powers of the Public Service Commission were not intended to apply to the contractual rates of the rapid transit railways, express provision to that effect would be expected. Moreover, the legislation governing the service and the rates of fares of railroads or street railways provided for by statutes passed since 1907 places the power in the Public Service Commission to regulate such rates, indicating that the regu-

latory power had been reserved. Chapter 481 of the Laws of 1910, § 57; formerly the Railroad Law of 1890 (Laws 1890, c. 565), § 37, as amended by chapter 676 of the Laws of 1892; section 229 of the Railroad Law; Laws 1910, c. 481, formerly part of the Rapid Transit Act of 1875; Laws 1875, c. 606. In construing and giving effect to the provisions of the state statute, we look to the decisions of the state Court of Appeals. St. Cloud Pub. Service Co. v. City of St. Cloud, 265 U. S. 352, 357, 44 S. Ct. 492, 68 L. Ed. 1050. [12] Terms of a contract may be affected by the exercise of sovereign power, as where an injured person received a free pass on a line of a railroad for life under a contract, and later Congress, in regulating interstate commerce, forbade the issuance and use of free passes, except to certain persons designated, and forbade the charging of any rate other than that designated in published schedules. Louisville & Nashville R. R. v. Mottley, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671. There it was said, at page 483 (31 S. Ct. 271): "After the commerce act came into effect no contract that was inconsistent with the regulations established by the act of Congress could be enforced in any court." See Hunter v. Pittsburg, 207 U. S. 161, 28 S. Ct. 40, 52 L. Ed. 151; Worcester v. Worcester Consolidated St. Ry. Co., 196 U. S. 539, 25 S. Ct. 327, 49 L. Ed. 591. To change a contract rate under the state regulatory plan does not impair contract rights under the federal Constitution. Union Dry Goods Co. v. Ga. Public Service Corp., 248 U. S. 372, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420.

When in 1912 the Legislature of the state amended the Transit Act to give authority for contract No. 3, § 8 of the act provided that the contract should contain "such terms and conditions as to the rates of fare to be charged * * * as said commission shall deem to be best suited to the public interest." Indeed, this was in substance part of the act prior to 1907, when the Public Service Commission Law was adopted. As pointed out, the law had changed the policy existing when the rate provision was brought into the Rapid Transit Act. By express terms and by construction of the Court of Appeals of the state, the legislation resulting in the Public Service Commission Law was applicable to rapid transit rates and established a public policy prohibitive of permanent rates of fare. It declared in effect that no contract provision for a fixed continuing fare was "best suited" to or consistent with "public interest," and by section 26 it provided that "every unjust or

26 F.(2d)—58½

unreasonable charge made or demanded for any such service or transportation of passengers, freight or property or in connection therewith or in excess of that allowed by law or by order of the commission is prohibited." And section 49 of the act established the legislative policy that a rate was unjust and unreasonable, if insufficient to yield a reasonable compensation for the services rendered.

Thus the law created the duty of the Public Service Commission to administer and enforce the new state policy. That regulatory body had turned over to it all contractual powers of the former board under the Rapid Transit Act. It in effect limited the contractual capacity for a continuing fixed fare, for it made it the duty of the Public Service Commission to make the fare sufficient to yield reasonable compensation for the services rendered and no more. Undoubtedly this new public policy applied to rapid transit railroad carriers, as well as other public utilities.

With this policy thus established when the Legislature in 1912 amended the Rapid Transit Act, if it wanted to depart from the Public Service Commission Law, to amend it or modify it, or if it intended to grant regulatory powers under the Rapid Transit Act, it would have been an easy matter for the Legislature to have written into that act a statement excepting the rapid transit rates from the operation of the Public Service Commission Law. It refrained from doing so by word or fair implication. It left the fare provision of the Rapid Transit Act as it was before the adoption of the regulatory law which established the new policy. It in no clear and unmistakable phrase expressed an intention to nor did it delegate regulatory powers to the commission under the Rapid Transit Act. That had been cared for by the Public Service Commission Law.

Merely permitting the fare provision of the Rapid Transit Act to continue in the same phrase in which it existed prior to the adoption of the new policy in 1907 did not repeal the provisions of the Public Service Commission Law as to rate-making in any particular. The more reasonable assumption is that such nonaction involved no clear and unmistakable purpose on the part of the Legislature (City of Paducah v. Paducah Ry. Co., 261 U. S. 267, 272, 43 S. Ct. 335, 67 L. Ed. 647) to exclude the application of the Public Service Commission Law. The fare provision of the Rapid Transit Act, as amended by the Legislature in 1912, did not purport to grant unqualified authority to con-

tract for a fixed rate for the entire life of the contract.

The more reasonable view is that there should be contained in the contract "such terms and conditions as to rates of fare to be charged as the commission shall determine to be best suited to the public interest." Such "terms and conditions" should be consistent with the limitations and provisions of the Public Service Commission Law and be the contractual authority, thus confined to the establishing of temporary rates, and should not foreclose either party, if and when it became unjust and unreasonable, either because it was excessive or noncompensatory, to apply for a change. This does not destroy all right to fix a fare; it merely limits the contractual powers within the confines of the established public policy, which prohibited the suspension of the police power of the state over rates. It means that the contractual determination as to what terms and conditions as to rates of fare that are best suited to public interest must be in harmony, and not in defiance of the standard of public interest which the Legislature had itself declared and established in a law which it made applicable to all street railways and utilities.

Such a construction takes no undue liberty with the fare provision of the Transit Act. It restricts general and uncertain language and prevents nonaction of the Legislature with respect to the Transit Act from operating as an amendment to the Public Service Commission Act. By the language employed in the amendment of the Transit Act in 1912, it is inconceivable that it was the intent to vest the city with unrestrained discretion to suspend the police power over rates and leave it within its uncontrolled discretion to burden the city for an unlimited period, with an exorbitant or extortionate fare, or to condemn it to an inefficient service which would result from a noncompensatory rate.

Indeed, section 8, subd. 3, of the act provides: "Every such contract shall contain such terms and conditions as to the rates of fare to be charged and the character of services to be furnished, and otherwise as said commission shall deem to be best suited to the public interest, and subject to such public supervision, and to such conditions, regulations and requirements as may be determined upon by said commission, with like approval." There was no commission, other than the Public Service Commission to then or thereafter exercise this power and duty, both as to fares and services. Indeed, the commission has ever since been constantly exercising supervision as to service, but has refused to act in the matter of fares.

There has been no contracting away of the right to a reasonable return as in Southern Utilities Co. v. City of Palatka, 268 U. S. 232, 45 S. Ct. 488, 69 L. Ed. 930, and Columbus Ry., etc., Co. v. City of Columbus, 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648. In the latter case, a franchise was granted a railroad company which sought to surrender it and then brought an action to restrain the city authorities from compelling it to operate its lines of street railway under the franchises and to charge only rates of fare prescribed by the franchises. The court held that equity, cannot relieve the company from a bad bargain. At the time the railroad company sought relief, the Legislature of Ohio had not, like in the instant case the Legislature of New York had, in the exercise of state sovereignty, established a regulatory plan by which franchises and contract rates may be regulated upward or downward as conditions justify.

In Henderson Water Co. v. Corporation Comm., etc., 269 U. S. 278, 46 S. Ct. 112, 70 L. Ed. 273, the parties were bound by the contract made before the state had adopted its Corporation Commission Law and thereby exercised its regulatory power. The corporation applied for an increase in rates to the Corporation Commission and was allowed one-half the amount asked for. It was not content, but proceeded in the federal court, asking protection against confiscation. The Supreme Court affirmed the District Court in its view that the water company should have applied for resumption of the hearing after a test of six months on the new rates, and exhausted its remedy there, before it resorted to a rate suit. There the state Supreme Court sustained the power of the commission to fix rates different from the rates stipulated in the franchise.

The claim of the plaintiff here is that the contract rates could be changed only by resorting to the procedure of the regulatory plan of the state which delegated power to the commission under section 49 of the Public Service Commission Law and power to the plaintiff under sections 28, 29, to change the rates by the methods therein prescribed. This it had sought without avail, previous to the institution of this suit. In Southern Utilities Co. v. Palatka, 268 U. S. 232, 45 S. Ct. 488, 69 L. Ed. 930, the Florida Legislature had vested the city with power to make a rate by contract, but the Legislature had no commission and no regulatory procedure which the corporation could invoke to bring

about an increase which it sought. The Supreme Court held that the corporation was bound by its contract, but pointed out that "there is nothing in this decision inconsistent with Southern Iowa Electric Co. v. Chariton, 255 U. S. 539 [41 S. Ct. 400, 65 L. Ed. 764]; San Antonio v. San Antonio Public Service Co., 255 U. S. 547 [41 S. Ct. 428, 65 L. Ed. 777]; and Ortega Co. v. Triay, 260 U. S. 103 [43 S. Ct. 44, 67 L. Ed. 153]."

In City of Cleveland v. Cleveland Ry. Co., 194 U. S. 517,[1] in sustaining the contract, the court held that the provisions as to the rate of fares were fixed in the ordinance for a stated time and "no reservation was made of a right to alter." In Georgia Ry. & Power Co. v. Town of Decatur, 262 U. S. 432, 43 S. Ct. 613, 67 L. Ed. 1065, when the contract was made, the General Assembly had never exercised authority to fix rates, and the state Supreme Court held that there was nothing in the Constitution of the state which precluded the municipality from contracting as to fares, and that "while the matter was one falling within the police power, whose exercise could not be abridged by contract, it was competent for the municipality to enter into such a contract where the state had not exercised and was not seeking to exercise its police power over the subject, and that this contract would remain effective until there should be conflicting legislative action."

In Tampa Water Works v. Tampa, 199 U. S. 241, 26 S. Ct. 23, 50 L. Ed. 170, the state Constitution provided that "the Legislature is invested with full power to pass laws for the correction of abuses and to prevent unjust discrimination and excessive charges by persons and corporations engaged as common carriers in transporting persons and property, or performing other services of a public nature, and shall provide for enforcing such laws by adequate penalties or forfeitures." Pursuant to this clause, an act was passed empowering the city authorities to pass an ordinance to prescribe maximum charges for water "such charges to be just and reasonable: Provided, that this act shall not be so construed as to impair the validity of any valid contract heretofore entered into between any city, town or village and any person, firm, or corporation for the supply of water to such city, town, or village or its inhabitants. But this act shall not be held to validate any contract heretofore made." After the Constitution, but before this act, the city made a contract with the water company giving the company the right to charge certain rates. Thereafter, pursuant to the constitutional provision and the act referred

to, the city passed an ordinance lowering the maximum rates to be charged. The court sustained the validity of the ordinance. It followed the interpretation of the Constitution, act, and ordinance as construed by the state court, and said:

"But so far as it expressed a power of the Legislature, of course, as soon as the Constitution went into effect, that power existed at once, and contracts afterwards were made subject to the possibility of its exercise, as it was exercised by the subsequent statute. * * * The single question is whether the city of Tampa is bound for 30 years from the date of its agreement to permit certain specified rates to be charged, even if they have ceased to be reasonable. We are not prepared to say that the Supreme Court of Florida was wrong in deciding that it is not bound under the Florida Constitution and laws."

It further held that, under the interpretation of the Constitution given by the Florida courts, the Legislature was not at liberty to give up the duty of preventing excessive charges. It was an inalienable power. To like effect, see San Antonio Traction Co. v. Altgelt, 200 U. S. 304, 26 S. Ct. 261, 50 L. Ed. 491; Puget Sound Traction, etc., Co. v. Reynolds, 244 U. S. 574, 37 S. Ct. 705, 61 L. Ed. 1325; City of Houston v. Southwestern Bell Tel. Co., 259 U. S. 318, 42 S. Ct. 486, 66 L. Ed. 961.

[13] The rule is well established that the renunciation of a sovereign right of this character must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction. Milwaukee Electric Ry. & Light Co. v. R. R. Comm. of Wisconsin, 238 U. S. 174, 180, 35 S. Ct. 820, 59 L. Ed. 1254; Home Tel. Co. v. Los Angeles, 211 U. S. 265, 273, 29 S. Ct. 50, 53 L. Ed. 176. This construction is consistent with the state court decisions to which we should give sanction. Denney v. Pacific Tel. & Tel. Co., 48 S. Ct. 223, 72 L. Ed. —— (decided Feb., 1928).

It is argued that the commission, as a state agency, could exercise or not, in its discretion, this power, but that meanwhile it lies as dormant as though no public service law had been adopted. Constitutional limitations require the Legislature itself to determine the public policy as to rates and itself to establish a legislative standard to be applied and executed by the delegated agency. That was what the Legislature did in the Public Service Commission Law. It declared a public policy as to rates and established a standard in the law itself (section 26). The com-

[1] 24 S. Ct. 756, 48 L. Ed. 1102.

mission was created by the law, not to initiate or establish a public policy or standard, but to administer and execute that established by the Legislature. Section 26 expressly prohibited the carrier itself from charging or collecting an unreasonable rate, thereby directly requiring that rates should at all times be kept reasonable in fact. Section 49 imposes upon the commission a duty to apply or execute that mandate of the law.

The guaranty of due process of the Fourteenth Amendment protects the right of a public utility to a fair return. There is but one limitation upon the right, namely, that it has not been contracted away pursuant to clear and unmistakable legislative authority to suspend the police power over rates. That condition does not obtain here. As said by Chief Justice White in So. Iowa El. Co. v. Chariton, 255 U. S. 539, 546, 41 S. Ct. 400, 402 (65 L. Ed. 764): "And, indeed, the necessity for this conclusion becomes doubly manifest when it is borne in mind that the right here asserted to contract in derogation of the state law and of the rule of public policy announced by the court of last resort of the state is urged by municipal corporations whose every power depends upon the state law."

[14] We therefore hold that the provisions of the lease in contract No. 3 "the lessee shall during the term of the contract be entitled to charge for a single fare upon the railroads and existing railroads the sum of 5 cents, but not more," was subject to the regulatory law and power of the Public Service Commission as effectively as though written in the contract, which means that, when this fare of 5 cents became unjust and unreasonable, it was subject to the commission's regulation. This marked the extreme limit of the power of the parties to contract as to the fare. When this provision of the contract bound the plaintiff to a 5-cent fare and the same became confiscatory, it contravened the express prohibition against the charging or collecting of unjust and unreasonable rates under section 26, and in turn the public policy which thus inhibited the suspension of the police power.

[15] The complaint, and affidavits in support thereof, show that for the year ending June 30, 1927, the plaintiff carried 1,173,646,256 passengers; of these 359,019,660 were carried by the elevated railroads. During the year the daily average was about 3,215,469 passengers. The plaintiff's railway system is divided into the Manhattan Division and the Subway Division. The total value (1927) of the property used in the system operated

by the plaintiff is alleged by it to be $898,-793,648, of which $142,894,000 is provided by the Manhattan Railway Company; $140,579,-474 is owned by the plaintiff and it has provided in addition $272,940,174; $342,380,000 is provided by the city. There is a total, as alleged, of $556,413,648 of property provided by the plaintiff.

The plaintiff has $35,000,000 par value of common stock; $162,700,000 refunding mortgage bonds; $44,331,560 in notes and $2,-890,000 in equipment trust certificates, which, together with other items, make an aggregate of its liabilities $403,950,373, which has not been substantially reduced since June 30, 1927. On that day, the charges of the plaintiff to its fixed capital, as defined by the uniform system of accounts, as ruled by the Public Service Commission, amounted to $413,312,720, which has not been substantially reduced since then. On January 31, 1928, the Manhattan Railway Company had outstanding $60,000,000 of common stock, $40,-671,000 in consolidated bonds, $4,523,000 in second mortgage bonds, and other liabilities of $1,851,159, making a total of $107,045,-159. At that date the fixed capital of the company was $112,943,654. The operation by the plaintiff upon a computation based on the plaintiff's present value figures of property provided by the companies, and on the transit commission figures for the city provided property, shows an actual earned return of 2.65 per cent. in 1926 and 2.52 per cent. in 1927. The earnings available at the present rate of fare are $22,622,761.

Using the value of the property thus computed in 1927 at $898,793,648, an 8 per cent. return (McCardle v. Indianapolis Co., 272 U. S. 419, 47 S. Ct. 144, 71 L. Ed. 316; Bluefield Water Works & Improvement Co. v. Public Service Commission of State of West Virginia, 262 U. S. 692, 43 S. Ct. 675, 67 L. Ed. 1176; Brush Electric Co. v. Galveston, 262 U. S. 443, 43 S. Ct. 606, 67 L. Ed. 1076; Brooklyn Union Gas Co. v. Prendergast (D. C.) 7 F.(2d) 672, affirmed 272 U. S. 580, 47 S. Ct. 199, 71 L. Ed. 421) would require at least $71,903,492—which would leave a deficit of $49,280,731. Using this property, the actual return was as low as 1.92 per cent. in 1921 and never higher than 2.65 per cent. in 1926. A computation based upon the present value of the property provided by the plaintiff, exclusive of city provided property, shows a 3.61 per cent. return actually earned in 1927; this is reached upon the assumption that the present value of the company owned and company provided property amounts to $554,413,648, with a balance of $24,490,775

available as a return, leaving a deficit of $24,-335,899 in earnings below an 8 per cent. return. A computation based alone upon the present value of the company owned property, exclusive of the city owned property and company provided property, shows a 4.05 per cent. return actually earned in 1927. [16] It is argued that, if the plaintiff prevails and there is daily confiscation, the city owned property may not be taken into consideration. The return guaranteed by the Constitution is upon the property devoted to public use. The determination of what rate should be prescribed, which will yield a return that is fair and reasonable, depends upon the present value of the property used. Ottinger v. Brooklyn Union Gas Co., 272 U. S. 579, 47 S. Ct. 199, 71 L. Ed. 421; State of Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Comm., 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; Willcox v. Consol. Gas. Co., 212 U. S. 19, 52, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. In Willcox v. Consol. Gas Co., supra, the court said: "And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase."

And in the Minnesota Rate Cases, supra: "The making of a just return for the use of the property involves the recognition of its fair value, if it be more than its cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law." Property leased by the operating company and used in making a return is included in the valuation. Minn. Rate Cases (C. C.) 184 F. 765, affirmed 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18. In Bd. of Public Utility Com'rs v. N. Y. Tel. Co., 271 U. S. 23, 31, 46 S. Ct. 363, 366 (70 L. Ed. 808), the court said:

"The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service. And rates not sufficient to yield that return are confiscatory. [Citing cases.] Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service. * * * "

[17] The city's property is earning the return as well as the plaintiff's and the plaintiff's leased railway. All must be considered in calculating the capital making the return and rendering the service.

[18, 19] The denial by the commission of a change of rate of fare is a denial of due process of law. The commission did more than refuse to act. On February 14th, rejecting the proposed new rates, it instituted injunction proceedings to forbid their operation. A forced continuance of confiscatory rates amounts to a denial of due process of law. Home Tel. & Tel. Co. v. Los Angeles, 227 U. S. 278, 33 S. Ct. 312, 57 L. Ed. 510; Alton Water Co. v. Ill. Commerce Comm. (D. C.) 279 F. 869. Under the present rate of fare, it is established that upon the investment there would be a continuous confiscation, and this amounts to taking property without due process of law in contravention of the Fourteenth Amendment to the federal Constitution. Newton v. Consolidated Gas Co., 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538; Oklahoma Operating Co. v. Love, 252 U. S. 331, 40 S. Ct. 338, 64 L. Ed. 596; La. Water Co. v. Public Service Comm., etc. (D. C.) 294 F. 954; Streator Aqueduct Co. v. Smith (D. C.) 295 F. 385; Augusta-Aiken Ry. & Electric Corp. v. R. R. Comm. of So. Carolina (C. C. A.) 281 F. 977. The plaintiff, having established its claim of confiscation of its property, is entitled to the injunctive relief it seeks.

[20] In conclusion, we take notice of the views expressed by counsel on the argument, who criticized the plaintiff for proceeding in the District Court, as said, in an effort to defeat the state court of its jurisdiction. This court takes jurisdiction, not as a matter of discretion or comity, but as a matter of duty, and it is not important whether the state court might have heard the case. There is no discretion or comity. A federal court when appealed to in protection of constitutional rights over which it has, by law, jurisdiction, may not avoid assuming jurisdiction. Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257. When it properly assumes jurisdiction, the court may not be spoken of as precipitate in its conduct. Because the case is one of local interest only is entirely immaterial. If the parties are citizens of different states, or there is brought into question constitutional protection, the right of a plaintiff to choose the federal

court, where there is a choice, cannot properly be denied. Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034.

Plaintiff did all it could under the state law to obtain administrative relief and its two applications, even prior to the present effort to obtain relief were denied, the claim of the commission being that the contract forbade its acting in regulation of the rates. This squarely raised the question of the plaintiff's constitutional right to protection and this it pressed in the familiar form of a rate suit and it has established its claim of daily confiscation.

An injunction will issue against the defendants and their successors, restraining them and each of them, their officers, agents, and employees, from in any way enforcing or attempting to enforce against the plaintiff a rate of fare of 5 cents per passenger for the transportation of passengers upon the rapid transit railroad lines operated by it or upon it and the Manhattan division and the subway division, or from enforcing or attempting to enforce against the plaintiff orders, directions, tariff schedules or certificates in so far as they prohibit or have been or are construed by any of the defendants or their predecessors, to prohibit the plaintiff from charging for the transportation of passengers on its railroad lines, a fare per passenger in excess of 5 cents, and the plaintiff, until the report of the master to be appointed to take proofs and report to this court, may charge 7 cents per passenger over its rapid transit railway lines operated by it without interference or prohibition by the defendants, their officers, agents, servants, or employees.

The order will provide that the plaintiff shall file with the clerk of this court a good and sufficient bond, in a sum to be approved by this court, conditioned upon the prompt payment to the defendants, of all costs and damages which may be incurred or suffered by any party to this suit who may be found to have been wrongfully enjoined or restrained hereby, and further conditioned so that, in the event that this preliminary injunction order shall be hereafter dissolved, the plaintiff will repay to its several passengers affected thereby, with interest, in such manner and to such extent as the court may direct, any sums paid by them for transportation furnished by the plaintiff from the date of the entry of the order and pending the suit in excess of the sums now chargeable to them of 5 cents per passenger. A master will be appointed to take proofs and report to this court.

If the defendants feel aggrieved, and wish to appeal from the order to be entered herein, a stay will be granted upon condition that a bond of the city in a sufficient sum be furnished indemnifying the plaintiff against further daily confiscation of its property, or if it be otherwise advised, and the defendants wish to apply to the Supreme Court for a stay of the order to be entered until that court hears the appeal, a stay for a reasonable time will be granted to enable the defendants to make such application to the Supreme Court.

KNOX and BONDY, District Judges, concur.

### Supplemental Decree.

PER CURIAM. This cause came on to be heard under an order to show cause granted February 28, 1928, upon the application of the plaintiff, and was argued by counsel, and thereupon, upon consideration thereof, and the opinion of the court having been filed herein on May 2, 1928, and it appearing to this court that the present maximum rate of fare of 5 cents per passenger upon the rapid transit railroad lines operated by the plaintiff, and upon each the Manhattan division and the subway division thereof, has been, and now is, and will continue to be, insufficient to yield a reasonable compensation for the service rendered and to provide a fair return upon the fair and reasonable value of the property used by the plaintiff in the public service, and unjust, unreasonable, and confiscatory of the property used by the plaintiff in the public service, and will inflict a continuing daily confiscation of its property, against which the plaintiff is entitled to be protected or indemnified, during the pendency of this suit; that the enforcement of such maximum fare of 5 cents and of the legislative acts or acts legislative in character of the state of New York imposing or requiring the observance of such rate of fare, contravene the guaranties of the Fourteenth Amendment of the Constitution of the United States; that the enforcement or the attempting of the enforcement in any way against the plaintiff of a rate of fare of 5 cents per passenger for the transportation of passengers upon the rapid transit railroad lines operated by it, or upon each the Manhattan division and the subway division thereof, or the enforcement or the attempting of the enforcement against the plaintiff of legislative acts of the state

of New York, and particularly the provisions of the Public Service Commission Law (chapter 429 of the Laws of 1907, made chapter 48 of the Consolidated Laws by chapter 480 of the Laws of 1910, as amended and supplemented), chapter 743 of the Laws of 1894, the Rapid Transit Act (chapter 4 of the Laws of 1891, as amended and supplemented), and the Railroad Law (chapter 481 of the Laws of 1910, as amended and supplemented); of orders or directions of the Transit Commission and/or the Public Service Commission for the First District of the state of New York; of the tariff schedules published and filed by the plaintiff, of the contracts Nos. 1, 2, and 3, dated respectively February 21, 1900, July 21, 1902, and March 19, 1913, and their modifications, and/or of the certificates for elevated extensions and third-tracking, dated March 19, 1913, in so far as the said statutes, orders, directions, schedules, contracts, and/or certificates, or any of them, prohibit, or have been or are construed by any of the defendants or their predecessors to prohibit, the plaintiff from charging for the transportation of passengers on the rapid transit railroad lines operated by it, or on any thereof, a fare per passenger in excess of 5 cents, will result in immediate, continuing and irreparable loss and damage to the plaintiff unless a preliminary injunction is granted herein, as hereinafter set forth:

It is ordered, adjudged, and decreed as follows:

First. Pending the final decree in this action, and until the further order of this court, the defendants John F. Gilchrist, Leon G. Godley, and Charles C. Lockwood, constituting the transit commission, the same being the Metropolitan division of the department of public service of the state of New York, and the defendant the city of New York, and their successors, and each of them, and their privies, and each of their respective officers, agents, counsel, servants, and employees, and any and every person acting or attempting to act under and by virtue of the authority of the acts of the Legislature of the state of New York, the orders or directions of the said transit commission or its predecessors, the tariff schedules filed by the plaintiff with the said transit commission or its predecessors, the contracts Nos. 1, 2, and 3, dated respectively February 21, 1900, July 21, 1902, and March 19, 1913, with their respective modifications, or the certificates for elevated extensions and third tracking, dated March 19, 1913, or of any of them, or of any other provision of statute

of the state of New York, be and are hereby enjoined and restrained—

(1) From in any way enforcing or attempting to enforce, against the plaintiff, a rate of fare of 5 cents per passenger for the transportation of passengers upon the rapid transit railroad lines operated by it, or upon each the Manhattan division and the subway division thereof.

(2) From in any way enforcing, or attempting to enforce, against the plaintiff, the provisions of the said acts, orders, contracts, tariff schedules, or certificates, in so far as they prohibit, or have been, or are construed by any of the defendants or their predecessors, to prevent the plaintiff from charging for the transportation of passengers on its rapid transit railroad lines, or upon each the Manhattan division and the subway division thereof, a fare per passenger in excess of 5 cents.

(3) From bringing and/or prosecuting any suit, action or proceeding to enforce any penalties or forfeitures, under the said Public Service Commission Law, the said Railroad Law, the said Rapid Transit Act, chapter 743 of the Laws of 1894, or any other law, the said orders or directions, the said contracts Nos. 1, 2, and 3, or the said elevated railroad certificates, against the plaintiff, or by mandamus, injunction, summary proceeding, or otherwise to compel compliance by the plaintiff with the provisions of the said acts, orders, tariff schedules, contracts, or certificates, or any of them, in so far as they, or any of them, impose a maximum rate of fare of 5 cents per passenger, or prohibit the plaintiff from charging a rate of fare of 7 cents per passenger, or any rate in excess of 5 cents per passenger, upon the said rapid transit railroads or upon each the Manhattan division and the subway division.

(4) From doing any act or thing interfering with the right or authority of the plaintiff forthwith to charge or receive for the transportation of passengers by it, upon the said rapid transit railroad lines, or upon each the Manhattan division and the subway division, a rate of fare of 7 cents per passenger.

Second. This injunction is granted, and will be continued, upon condition that, pending final decree in this action or until the further order of this court—

(a) The plaintiff shall, from and after the entry of this decree, except as hereinafter provided, charge and collect a rate of fare of 7 cents per passenger upon the rapid transit railroads operated by it, as shown by

its tariff schedules on file with the Transit Commission and posted in its several stations, and shall issue to each passenger paying such fare a refund ticket for each fare paid, such refund ticket to read and be conditioned as hereinafter provided.

(b) Within five days after the entry of this order, the plaintiff shall file with the clerk of this court, in form and tenor first approved by one of the judges of this court, a good and sufficient bond or bonds of a surety company or companies, in the sum of five million dollars ($5,000,000), conditioned upon the prompt payment by the plaintiff to the defendants, upon the direction of the court, of all costs and damages which may be incurred or suffered by any of them, respectively, who may be found to have been wrongfully enjoined or restrained hereby, and further conditioned so that, in the event that this preliminary injunction order shall hereafter be dissolved, and it shall be finally decided that the plaintiff was and is not entitled to relief in this action, the plaintiff shall promptly repay to its several passengers affected thereby, to such extent as the court may direct and in the manner hereinafter provided, and/or as the court may further provide and direct, any sums paid by such passenger for transportation upon the rapid transit lines operated by the plaintiff, pending the final determination and decree in this suit, in excess of the sums now chargeable to them at the rate of 5 cents per passenger; any such repayments to passengers to carry and include interest upon such excess sums from and after the 16th day of the month in which any such fares in excess of 5 cents were paid by any such passenger.

(c) As and when the excess of the amount collected by the plaintiff over the rate of 5 cents per passenger shall aggregate the said sum of the bond or bonds so given by the plaintiff, the plaintiff shall furnish and file a similar bond or bonds in a like sum and upon the same approval and conditions, or in such sum and/or upon such conditions as the court by further order, upon its own motion or the application of any party hereto upon notice, may direct.

(d) During the pendency of this action, the plaintiff shall cause to be placed and kept posted on its bulletin board or other conspicuous place, in each of its subway and elevated stations, and in or near all places where copies of its tariff schedules are posted, a notice in plain and conspicuous type and color, in substantially the following form:

"Keep Your Refund Tickets In Order to Protect Your Rights.

"Pursuant to the order entered by the United States District Court for the Southern District of New York on May ——, 1928, the Interborough Rapid Transit Company has been authorized to charge and collect a fare of 7 cents per passenger, pending final decree in the action brought by the company to enjoin the 5-cent rate as confiscatory. The amounts collected by this company in excess of five (5) cents per passenger will be subject to the further direction of the court.

"Refund will be made as so directed, if it shall be finally decided that the company was and is not entitled to charge and collect a fare of more than 5 cents per passenger. The company has filed a bond to insure such repayment to its patrons.

"Each passenger, upon paying his fare, will therefore receive a refund ticket for the excess over 5 cents. These tickets should be carefully preserved, as they will evidence the passenger's right to receive repayment of such sums as may be directed by the court, puruant to the said order, in the event the said action is finally decided against the company.

"For a copy of the said order and further information as to the rates of this company and the regulations applicable thereto you may examine the copy of its tariff schedule, on file with each of its ticket agents and in the offices of the transit commission at No. 270 Madison avenue, borough of Manhattan, New York City.

"Frank Hedley,
"President Interborough Rapid Transit Company."

The plaintiff shall cause a copy of this order to be filed and kept with and as a part of its tariff schedule, during the continuance of this preliminary injunction, in all stations, offices, and places where its said tariff schedule is now posted or filed.

(e) During the pendency of this action, the plaintiff shall cause to be placed, in red ink or other distinctive color or colors, conspicuously on one side of each such refund ticket issued by it to its passengers at a rate of fare in excess of 5 cents per passenger, the figure and word "7 cents" and the words:

"Keep This Slip to Protect Your Rights."

And on the reverse side of each such refund ticket the plaintiff shall cause to be

printed a notice in substantially the following form:

"If it is finally determined that this company is not entitled to charge more than *five cents* per passenger, refund upon this ticket will be made as directed by the order of the United States District Court."

(f) If the plaintiff shall, for the convenient operation of its said rapid transit lines at the said rate of fare of 7 cents per passenger during the pendency of this suit, issue and sell any tokens or other evidence of the right of a purchaser to a single and continuous ride upon the said lines as in the said tariff schedules provided, any such token or evidence of the right of the purchaser to such transportation shall be so accepted for such transportation only during the continuance of the seven-cent fare granted by this preliminary injunction, but shall be redeemed by the company in cash, at any of its said stations, at any time upon the request of the holder thereof, upon the presentation of the same and of a like number of refund tickets, irrespective of whether this order is or is not in effect at the time of such presentation for redemption; other reasonable rules and regulations pertinent to any such tokens and refund tickets and not inconsistent with this order may be established as a part of the tariff schedules of the plaintiff.

(g) The plaintiff shall bring this cause to trial and to final decree with all convenient speed.

Third. During the pendency of this suit, the plaintiff shall file, on the 16th day of the month following and on the 16th day of each and every month thereafter, in the office of the clerk of this court, a statement verified by its president, vice president, comptroller, secretary, or other authorized officer, showing the amounts charged and collected by it during the preceding calendar month, from passengers on the rapid transit railroads operated by it, in excess of a rate of fare of 5 cents per passenger; such verified statement also to certify that the sum so shown is all that has been so charged and collected during such preceding calendar month.

Fourth. (1) Hon. John Proctor Clarke is hereby appointed special master to take the testimony and evidence upon the issues herein, make all needed computations and fully hear the facts, and to report to the court his findings of fact and conclusions of law, together with the evidence, for the advisement of the court: Provided that nothing herein contained shall be construed as meaning that the special master's findings

26 F.(2d)—59

of fact shall be final, but only that he shall find the facts for the purpose of aiding the court and making his recommendations. The said master shall, before submitting to the court his final report, and in accordance with the practice in this court, prepare and serve on the solicitors for the respective parties hereto a draft of such report.

(2) The said special master shall hold a session on May ——, 1928, at 10:30 o'clock in the forenoon, at a place to be determined and announced by him, for the purpose of fixing at that time the date when he will proceed to the hearing of the testimony and evidence in this cause. After the master shall have entered upon said hearing, he shall proceed as speedily as practicable.

(3) The said master shall report to the court, at the earliest practicable date, all the testimony and evidence received by him, together with his findings of fact and his recommendations as to the facts and the law.

Fifth. At any time while the preliminary injunction hereinbefore granted remains in force, any party hereto, or his or its successors or assigns, may apply, upon notice, to vacate, modify, or change the terms of this order, because of any change of circumstances since the entry hereof, or for any additional relief to which he or it may deem himself or itself entitled by reason of any acts or events occurring after the entry of this order.

Sixth. (1) If an appeal from this order is taken by the defendants, or any of them, to the Supreme Court of the United States, then, upon condition that, on or before May 28, 1928, a good and sufficient bond or bonds of the city of New York and/or other responsible corporation be filed by or in behalf of the defendants or any of them, in the sum of $5,000,000 and in a form and tenor to be approved by one of the judges thereof, conditioned for the indemnifying of the plaintiff against further daily confiscation of its property during the pendency of such appeal, a stay of the taking effect and operation of this injunction and of each of the various provisions of paragraph "Second" of this order, until the hearing and determination of such appeal, is hereby granted, and if it shall appear at any time before an appeal is heard and determined that such bond is inadequate protection, an application will be entertained for further indemnity.

(2) The defendants having given notice of intention to appeal from this order and having applied to one of the Justices of the

Supreme Court of the United States for a stay of the taking effect of this order, when entered, until that court hears and determines such appeal, and May 14, 1928, having been appointed by the Supreme Court when such application by the defendants for such a stay may be heard, it is hereby ordered that a stay of the taking effect of this injunction and of the several provisions of paragraph "Second" of this order is hereby granted to the defendants, until the hearing and determination by the Supreme Court of such application for a stay pending appeal from this order.

(3) The stay granted to the defendants by subdivision (2) of this paragraph is granted, and shall continue in force, only upon condition that the defendants, and each of them, shall make their application to the Supreme Court for a stay so that the same may be heard by the full court on Monday, May 14, 1928, or such other days as appointed by the court, and shall seasonably submit all papers in support of such application within the times allowed by the court; and the stay granted to the defendants by subdivision (1) of this paragraph shall be in effect only upon condition that the defendants, and each of them, appealing from this order, shall perfect and prosecute any such appeal and print and file the transcript of record and all necessary papers to that end, promptly and without unreasonable delay, and shall, with all convenient speed thereafter, serve a notice of application to the Supreme Court to advance the said appeal for early hearing upon the calendar of the said court.